## Case No. 9,924.

MUNGOSAH v. STEINBROOK.

[3 Dill. 418.][1]

Circuit Court, D. Kansas. 1875.

Before DILLON, Circuit Judge, and FOSTER, District Judge.

## Case No. 9,925.

In re MUNN.

[3 Biss. 442; 7 N. B. R. 468; 7 Am. Law Rev. 751.][1]

District Court, N. D. Illinois. Jan., 1873.

BANKRUPTCY—NON-PAYMENT OF COMMERCIAL PAPER—DEFENSE—TRANSFER TO COPARTNER—SECRET PARTNER.

1. A man should not be adjudged bankrupt for non-payment of commercial paper if he has reasonable ground to believe that he is not liable upon it.

2. If he can satisfy the court that he has good reason for disputing his liability, especially where he is in fact solvent, and has paid all other just claims, this court should not entertain jurisdiction, but should remit the parties to the ordinary remedies.

3. A transfer of firm property from one member of a solvent firm to another is not an act of bankruptcy within section 39 of the act [of 1867 (14 Stat. 536)]. Such a transfer is not a fraud upon the creditors of the firm, nor does it hinder or delay them, or constitute a preference contrary to the provisions of the act.

4. In order to charge a secret partner for the debts of the firm, it is necessary to show that such debts were contracted in the name and business of the firm, or that he had an interest in the contract or profits.

5. Where the purchaser of a note did not know that there were any secret partners with the persons whose names appeared upon its face and for whose individual benefit it was given, and placed the proceeds to the credit of the holder, the secret partners would not be liable.

6. The fact that such purchaser afterwards proved his claim in bankruptcy against the signers of the note alone tends to show that he understood them alone to be liable, and discounted it upon their responsibility.

7. Where firms composed of different members were doing business under the same firm name, circumstances stated under which dormant partners may not be liable.

This was a petition in bankruptcy filed by the Cook County National Bank of Chicago, against the firm of Munn & Scott, alleging that such firm was composed of Ira Y. Munn, George L. Scott, George Armour, Albert A. Munger, Hiram Wheeler, Charles W. Wheeler, George H. Wheeler, James R. McKay, Perry H. Smith, and George L. Dunlap, and charging that those parties were indebted to the bank upon two notes of $5.000 each, executed by and in the name of Munn & Scott, one dated August 14, 1872, due in ninety days,

---

[1] Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission. 7 Am. Law Rev. 751, contains only a partial report.]

payable to George R. Chittenden or order, the other bearing date on the 14th day of October, 1872, due in ninety days, payable to said bank, indorsed by Munn & Scott. The petitioner charged as acts of bankruptcy: 1. That the firm of Munn & Scott being traders, etc., had stopped payment of their commercial paper, the notes described, and had not resumed within a period of fourteen days, nor up to the time of filing the petition. 2. That the firm of Munn & Scott, on the 23d day of September, 1872, transferred its property and effects to George Armour & Co., a firm alleged to be composed of all the parties constituting the firm of Munn & Scott, except Ira Y. Munn and George L. Scott, with intent to delay and hinder the creditors of the firm of Munn & Scott. 3. That the firm of Munn & Scott, on the 23d day of September, 1872, transferred to George Armour and others, for its use, all its property and assets to hinder and delay the creditors of Munn & Scott. The prayer of the petition was that the firm of Munn & Scott, consisting of the parties named in the petition, might be adjudged bankrupts. All the parties named, except Ira Y. Munn and George L. Scott, appeared and filed answers denying their liability upon the notes set up, denying that they executed the notes, or that they ever were members of the firm of "Munn & Scott" who executed the notes, and denying all the acts of bankruptcy stated in the petition.

George C. Campbell, for petitioning creditor.

John N. Jewett, Wm. C. Goudy, and Wirt Dexter, for respondents.

Before HOPKINS and BLODGETT, District Judges.

HOPKINS, District Judge. By the testimony introduced, it appears that Ira Y. Munn and George L. Scott, previous to the year 1864, owned and were interested in various elevators in this city, and were doing, under the name of Munn & Scott, the business of receiving, storing, and selling grain, and a general commission business. It also appears that a portion of the other parties were doing a like business under other names, and different from Munn & Scott; that in September, 1864, Munn & Scott, and the parties owning and doing business at the other elevators in this city, entered into a contract whereby they agreed to "stock the use of such elevators and to engage as partners" in receiving, storing, and shipping grain, and to divide the profits of such business according to certain terms, mentioned in the agreement. That agreement relates only to the business of "receiving, storing and shipping grain," including the keeping in repair of the elevators and machinery, and paying the expense of such repairs, and the rebuilding of the elevators in case of destruction.

The business was to be carried on under two names: That at the elevators known as the Northwestern, the Munn & Scott, the Union and the City, in the firm name of Munn & Scott, and at the elevators on the north side of the river, under the name of Munger, Wheeler & Co. Receipts for grain received at the elevators first named were to be issued in the name of Munn & Scott, and the others in the name of Munger, Wheeler & Co.; the earnings of all to be treated as belonging to one firm, or "pooled," as it was called, and after paying the expenses of transacting the business, divided as agreed between the parties. It appears that the business of receiving, storing and shipping grain was done in that way by the firm of Munn & Scott, until the 23d of September, 1872, some new parties having been introduced into the firm from time to time, so that at the time of the date of the notes first mentioned in the petition, the parties named in the petition were members of and composed that firm. After the formation of the partnership to do the elevator business, Ira Y. Munn and George L. Scott continued to do business outside of the elevator business, and were engaged in buying and selling grain and produce, and in other speculations wholly distinct from the elevator business, and in which the parties composing the firm doing the business of receiving and storing grain at the elevators had no interest or connection whatever. It also appears that in 1865 or 1866, Munn & Scott entered into a partnership with other parties under the firm name of Munn, Norton & Scott, engaged in a general commission business. The firm of Munn & Scott, composed of Ira Y. Munn and George L. Scott, alone, continued to do business until the bankruptcy proceedings were commenced against the firm of Munn, Norton & Scott, on or about the first of November last. It does not appear that it was known outside of its members who composed the firm doing the warehouse and elevator business, until after bankruptcy proceedings against Munn, Norton & Scott. A portion of the warehouse receipts was signed "Munn & Scott," and another portion "Munger, Wheeler & Co." There is no evidence that the public or the dealers with that firm knew that any other persons were interested in that business than the parties whose names appeared upon the receipts, or that the two firms were composed of the same persons. Mr. Munn swears he never gave a note for that firm in the elevator business, or a note that he meant or understood bound anybody but himself and Mr. Scott, and Mr. Armour, another member of the firm, says none were given by Munn & Scott, to his knowledge, except two, one being for supplies and the other for machinery to be used in and about the business. Nor does it appear that the elevator firm ever did any other business or was interested in any business except the receiving, storing and shipping of grain, as mentioned in the articles of copartnership. So far as the evidence produced goes, that company never incurred any

liability in any other manner or form than by giving warehouse receipts for grain stored in the elevators, except such as they incurred for freight on grain stored in the elevators, or for expenses incurred in conducting the business; while Munn & Scott, as a separate firm, were doing a business of buying and selling grain in the market, and in that way and business were using their firm and individual credit to quite a large extent, as was also the firm of Munn, Norton & Scott. Both of these firms were in good credit until the latter part of August last, when they became involved in a wheat "corner," which broke them up and rendered them insolvent.

These are the facts as established by the evidence in relation to the partnership of the respondents, and the business done by them as such partners. The evidence as to Perry H. Smith and Geo. L. Dunlap's connection with the firm is very slight, but in view of the course pursued upon the trial, it may, in the absence of any rebutting testimony, be considered sufficient. It is preferable, also, to dispose of the case upon its merits rather than upon a technical objection of that kind taken after the close of the trial. If the counsel for the petitioners had omitted to inquire of the parties as to Messrs. Smith and Dunlap's relation to the firm, under the impression that this had been proven, the court would have allowed him to do so even after the commencement of the argument in the case. From these facts it would seem that all the members of the elevator firm, except those whose names were used, were silent or dormant partners, and can only be held liable as such. On the face of these notes the only names are "Munn & Scott." The other respondents are strangers to the transaction. The contract of discount was made with Munn & Scott, and does not, per se, create any liability as to the others. The liability of a partner arises from pledging his name, if his name is introduced into the firm, thereby holding it out as a security to the community, or from receiving profits, if he be a silent partner. The principle upon which the liability of secret partners rests is essentially different from that of a known and open partner whose name appears in the business. A secret partner is liable not because credit is supposed to have been given to the firm by reason of his connection with it, but because he is one of the contracting parties, and is benefited by the profits of the contract, so that in order to charge a secret partner for debts contracted in the name of the firm of which he is a dormant member, it is necessary to show that such debts were contracted in the name and business of the firm, or that he had an interest in the contract or profits. Winship v. Bank of U. S., 5 Pet. [30 U. S.] 529; 1 Pars. Cont. 167; Bank of Alexandria v. Mandeville [Case No. 851]. The evidence in this case shows that although they had been in business for about eight years, no commercial paper had ever been given by the firm in the name of Munn & Scott, except the two notes before referred to. It would seem from this that the business did not require the use of credit in that way, and that it was not within the general scope of the business to give such paper, so that the liability of the contestants, if ostensible partners, might be a question of serious doubt.

In view of these questions, can it be pretended that the contestants are guilty of an act of bankruptcy in not paying these notes within fourteen days after maturity? Had they not reasonable grounds to believe they were not liable upon these notes? If they had, the non-payment for a period of fourteen days does not bring them within the spirit or meaning of the bankrupt act. They deny in good faith, we think, their liability upon these notes, and their non-payment, under such circumstances, should not be deemed an act of bankruptcy as against the contestants, especially as it is shown they are worth at least $1,500,000. It would not be sufficient to defeat the operation of the bankrupt act to simply deny liability upon the notes, but the party must satisfy the court that he has good reason for disputing his liability, and that his liability is involved in doubt. The existence of a valid note or claim is fundamental. Without that the bankrupt court cannot proceed; and when a party shows there is reasonable doubt upon that point, accompanied with evidence of a condition of solvency in fact, and of the payment of all other just claims and commercial paper, and shows that the non-payment complained of was simply because he did not owe the note or was not liable upon it, and also the further fact (which appears in this case,) that no demand had ever been made for the payment, a court of bankruptcy should not entertain jurisdiction, but should dismiss the petition and turn parties over to pursue the ordinary remedies provided in cases to collect debts of solvent parties. A different construction would make it necessary for parties engaged in trade to pay every note presented, or upon which it might be claimed they were liable, at the risk of being thrown into bankruptcy during the trial and investigation of the alleged liability, to the utter destruction of their credit. Such a construction would be subject to great abuse and would often lead to a perversion of the true objects and intents of the act. This construction has been generally given by the other courts to the provisions of the act under consideration. This court also has heretofore so construed it, and this case it not of such a character as to induce it to change its previously expressed opinion. There is no necessity for extending or straining the construction to protect the rights of the parties here, as these contestants are abundantly able to

pay the claim of the petitioners if it should be declared that they are liable for it, and the idea of adjudging such men bankrupts is asking of the court a judgment founded upon altogether too technical a construction of the bankrupt act. The courts have real bankrupts enough to deal with without extending their examination to include supposititious of fictitious cases. The contestants having shown, therefore, a sufficient reason for not voluntarily paying the notes described before their liability should be judicially determined, the suspension of payment on them for fourteen days is not an act of bankruptcy within the meaning of the bankrupt act.

The question of the contestants' liability is not intended to be absolutely determined in this case. The view taken of the bankrupt act renders that unnecessary. There was some evidence given tending to show that Chittenden, who procured the notes to be discounted by the petitioner, represented that the "elevator ring" were all bound, and that Mr. Munn so stated when the last note was given, and so Mr. Spencer, the president of the bank testifies. But Mr. Munn contradicts Spencer's testimony on that point. The evidence, therefore, as to what occurred between Mr. Munn and Mr. Spencer being balanced, and Mr. Chittenden not being called, we do not regard the fact as established. But if Mr. Spencer's account is correct, Mr. Chittenden did not disclose the names of the parties constituting the "ring," and there is no evidence that Mr. Spencer knew who they were. So conceding the facts to be as stated by Mr. Spencer, these parties, or a portion of them, were still silent partners; and as it appears that the proceeds of the notes did not go to the use of the firm of which they were members, and that they were not given for the benefit of that firm, nor in the business of that firm, it would not, in our opinion, materially change the question of the liability of such partners.

There are some additional circumstances calculated to excite a suspicion and raise a doubt as to the real business transacted by the elevator firm: Such as allowing Munn & Scott to keep the firm business in the same book in which they kept the other business of Munn & Scott; allowing the warehouse receipts to be signed in the name they used in their separate business. But they are not sufficient to authorize us to hold the other partners so clearly liable as to have required them to pay these notes without contest. We have considered these questions, but they have not impressed us as of sufficient importance to warrant us in holding that the respondents are liable so as to be proceeded against in bankruptcy for non-payment of these notes. It was very imprudent and hazardous on the part of the elevator firm to allow a portion of the business to be done under the circumstances in

such a manner by Munn & Scott. It naturally provoked just such claims as this, which they might have anticipated. The petitioners themselves could not have supposed these parties liable, we think, until quite lately, for they proved up their claim upon these notes as against Munn & Scott in the bankruptcy proceedings against Munn, Norton & Scott. If the president, Mr. Spencer, had understood that the persons proceeded against in this case were liable, why prove up the claim against Munn & Scott alone, who were insolvent? This conduct of the president, who now undertakes to establish the liability of these contestants, bears very directly upon the question as to who he understood at the time were liable, and has a direct tendency to show that when he discounted the notes he supposed Munn & Scott alone were liable upon them. The counsel for the petitioners claimed as having an important bearing upon the question of liability, the fact that these contestants, under the name of George Armour & Co., took up all of Munn & Scott's notes, which had as collateral the warehouse receipts of Munn & Scott. He argued that by so doing they admitted their liability. They did, undoubtedly, as to those receipts. They took up the receipts held as collateral to the notes of Munn, Norton & Scott, and it might as well be claimed that they admitted their liability upon those. By so doing they admitted their liability on the receipts, but they dispute their liability on the commercial paper of Munn & Scott, and we think they have cast such a doubt upon their liability thereon as to take the non-payment of these notes out of the operation of the bankrupt act.

The other acts of bankruptcy are not proven as alleged. The allegation is that the firm of Munn & Scott, (meaning all the parties to this proceeding,) transferred its property and effects to the firm of George Armour & Co., another firm. The proof is that Ira Y. Munn and G. L. Scott transferred their interest in the elevators and other firm effects to George Armour for the use of the firm. It was a simple transfer, by two of the partners, of their interest in the firm property to the other partners. That does not support the allegation in the petition, and we do not see how such a transfer could be maintained as within the meaning of the bankrupt act. We are not prepared to hold such a transfer to be a fraud upon the creditors of the firm, or as hindering or delaying the creditors of the firm, or as constituting any preference contrary to the provisions of the bankrupt act, particularly when the firm or the members composing the firm are solvent. From these views it follows that the petitioner has failed to prove the facts stated in the petition and the proceedings must be dismissed with costs.

NOTE. That non-payment of commercial paper to which the maker has, or in good faith

believes he has, a valid defense, is not an act of bankruptcy. In re Hercules Mut. Life Assur. Co. [Case No. 6,402]; In re Thompson [Id. 13,-936], and cases there cited.

As to liability of secret partners, consult Waugh v. Carver, 1 Smith. Lead. Cas. 1289, and cases there cited; T. Pars. Partn. 61–67; Bank of Alexander v. Mandeville [Case No. 851]; Ex parte Warren [Id. 17,191]; Bigelow v. Elliott [Id. 1.399]; Story. Partn. §§ 63, 373.

As to rights of creditors on transfer of firm property to one of the partners, consult, also, Howe v. Lawrence, 9 Cush. 553; Ladd v. Griswold, 4 Gilman, 25; Ketchum v. Durkee, 1 Barb. Ch. 480. As to such transfer by insolvent partners, see In re Cook [Case No. 3,150].